UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------
IN RE:

    BRUCE R. BURLINGAME                CASE NO. 04-68617

                      Debtor              Chapter 7
-----------------------------------------------------------
CAROL HOLLY

                      Plaintiff

           vs.                  ADV. PRO. NO. 05-80069

BRUCE R. BURLINGAME

                      Defendant
-----------------------------------------------------------
APPEARANCES:

CAROL HOLLY
Plaintiff
P.O. Box 7735
Nashua, NH 03060

KRISTIN M. SUNSER-KING, ESQ.
Attorney for Defendant
239 East Water Street
Syracuse, NY 13202

Hon. Stephen D. Gerling, Chief U.S. Bankruptcy Judge

**MEMORANDUM-DECISION, FINDINGS OF FACT,
CONCLUSIONS OF LAW AND ORDER**

The Court considers herein the adversary proceeding commenced on March 15, 2005, by Carol Ann Holly ("Plaintiff") seeking a denial of dischargeability of a debt, incurred by Bruce R. Burlingame ("Debtor"), pursuant to § 523(a)(2)(A) of the Bankruptcy Code (11 U.S.C. §§ 101-

2

1330) ("Code").[1] On April 14, 2005, a motion was filed by the Debtor seeking dismissal of the adversary proceeding based, *inter alia*, on insufficiency of service of process. With respect to the assertion that service of the summons and complaint was improper, Debtor's counsel alleged service had been made by the Plaintiff, a party to the proceeding, contrary to Rule 7004(a) of the Federal Rules of Bankruptcy Procedure ("Fed.R.Bankr.P."). In addition, counsel alleged that the Debtor had never been served with a copy of the summons and the complaint at the address listed in his bankruptcy petition. Instead, a copy of the complaint was sent to his attorney's office on or about March 19, 2005. Subsequently a copy of the summons was served on Debtor's counsel on or about March 22, 2005. In response, Plaintiff indicated that at the meeting of creditors, the Debtor indicated that he had moved from the address listed in his petition. Because he had not amended his petition to indicate his new address, she asserted that she served him at his attorney's office to assure that he would receive the documents.

After a hearing on the motion was held on July 5, 2005, in Syracuse, New York, the Court signed an Order on August 1, 2005, conditionally denying the motion to the extent that it was based on insufficiency of service and requiring that the Plaintiff, who appears pro se in this proceeding, serve the summons and complaint on the Debtor at the address listed in his bankruptcy petition.

On August 15, 2005, the Debtor filed an answer to the complaint denying the Plaintiff's allegations. Debtor's answer contains a counterclaim for attorney's fees and costs to which no

---

[1] The Bankruptcy Abuse Prevention and Consumer Protection Act of 2005 ("BAPCPA"), was signed into law on April 20, 2005, and made applicable to cases filed after October 16, 2005. Because the case herein was commenced on December 9, 2004, BAPCPA is not relevant to this discussion.

reply was filed by the Plaintiff.

The trial of the adversary proceeding was held on October 24, 2005. The Court heard testimony from the Plaintiff and her two daughters, Erin Holly Burlingame ("E. Burlingame") and Deirdre Holly Isola ("D. Isola"), as well as from the Debtor, called in support of Plaintiff's case. At the close of the Plaintiff's case, Debtor's counsel made a motion pursuant to Rule 52(c) of the Federal Rules of Civil Procedure ("Fed.R.Civ.P."), incorporated in Rule 7052 of the Fed.R.Bankr.P., requesting that the Debtor be granted judgment as a matter of law on the basis that the Plaintiff had failed to establish by a preponderance of the evidence that the debt owed Plaintiff was nondischargeable pursuant to Code § 523(a)(2)(A). The Court reserved on the Debtor's motion. Debtor's counsel called no witnesses in opposition to the complaint. In lieu of closing arguments, the parties were afforded an opportunity to file post-trial memoranda of law. The matter was submitted for decision on November 30, 2005.

## JURISDICTIONAL STATEMENT

The Court has core jurisdiction over the parties and subject matter of this adversary proceeding pursuant to 28 U.S.C. §§ 1334(b), 157(a), (b)(1), and (b)(2)(I).

## FACTS

The Debtor filed a voluntary petition pursuant to chapter 7 of the Code on December 9, 2004. In his schedules, included with the petition, he lists the Plaintiff as having an unsecured

claim in the amount of $110,726.37, based on a judgment. *See* Schedule F of the Debtor's Petition. According to the Debtor's Statement of Financial Affairs, the judgment was obtained in a New Hampshire state court for "alleged money loaned." *See* Statement of Financial Affairs at ¶ 4.

According to the Plaintiff, in August 1998 she was approached by the Debtor and her daughter, E. Burlingame, who was married to the Debtor at the time, asking that she mortgage her residence at 136 East Dunstable Road, Nashua, New Hampshire (the "New Hampshire property"). Plaintiff testified that the Debtor and E. Burlingame had indicated that the monies were needed to pay off the Debtor's debts so that he could move to New Hampshire. At the time, the Debtor was residing at 302 Bailey Road, North Syracuse, New York (the "North Syracuse property") and working in Syracuse.[2] He would travel from New York to New Hampshire on weekends and holidays to be with his wife. His visits to New Hampshire continued until approximately April 2000 according to Plaintiff.

The Plaintiff testified that in August 1998 when approached by the Debtor and her daughter about the mortgage, she had expressed concerns that she could not afford to make any mortgage payments. According to the Plaintiff, the Debtor assured her that he would be able to make the monthly payments.

The original mortgage was obtained from Champion Mortgage Co., Inc. in the amount of

---

[2] The Debtor testified that on October 4, 1985, his parents, Murray and Fern Burlingame, transferred the North Syracuse property to him in exchange for his giving them a mortgage in the amount of $49,000. *See* Debtor's Exhibit 20 and Plaintiff's Exhibit E. According to the Debtor, he was supposed to make mortgage payments to his other siblings upon the death of his parents. Instead, he testified on cross-examination that he had transferred the real property to them on June 6, 2003, dividing it seven ways.

5

$95,000 ("Champion Mortgage"). The Plaintiff testified that the proceeds of the Champion Mortgage were used to pay the Debtor's debts and to "invest" in her daughter's flower shop. A portion of the proceeds were also used to pay off back taxes on the New Hampshire property, although she was not able to provide any documentation as to the amount. She acknowledged that from the proceeds of the Champion Mortgage, a check in the amount of $74,000 was deposited into the joint account held by E. Burlingame and the Debtor on September 16, 1998. *See* Plaintiff's Exhibit K.

Admitted into evidence were certain checks written on that joint account in September 1998. A check, signed by E. Burlingame, and dated September 29, 1998, in the amount of $500 was issued to the Internal Revenue Service in response to a Notice of Intent to Levy sent to the Debtor for the tax period ending December 31, 1995. *See* Plaintiff's Exhibit R. A check in the amount of $2,517.50, also dated September 29, 1998, and signed by E. Burlingame, was issued to Sears in payment on an account in the name of the Debtor with a balance of $5,017.50. *Id.* According to the Debtor, E. Burlingame was an authorized user on the Sears account. The Debtor testified that because of poor credit, E. Burlingame was unable to get a Sears credit card in her own name. A third check, in the amount of $2,469.52, was written to American Express on an account in the Debtor's name. *Id.* According to the Debtor, he did not believe that E. Burlingame had used the American Express card to make any personal purchases. However, he testified that some of the purchases were for both him and E. Burlingame. Finally, on or about October 31, 1998, a check in the amount of $2,392 was issued to The Appliance Outlet in Nashua, New Hampshire, for the purchase of a refrigerator, freezer and range by the Debtor and E. Burlingame. *Id.* Neither the Plaintiff, nor the Debtor, could account for the balance of the proceeds from the

6

Champion Mortgage, although the Debtor testified that he understood that some of the monies were used to pay off debts incurred by E. Burlingame in connection with the flower shop business, including the settlement of a lawsuit against her. It was the Debtor's testimony that he had relied on his wife to pay the bills and did not question where the mortgage proceeds had gone.

It was the Plaintiff's testimony that the Debtor made approximately three monthly payments on the Champion Mortgage. The Plaintiff testified that sometime in early 1999 she was asked to refinance the mortgage. In this regard, the Debtor identified a Limited Power of Attorney ("POA") that he had signed on or about January 27, 1999, in favor of E. Burlingame, allowing her to "sign my name for real estate." *See* Plaintiff's Exhibit I. The Debtor testified that he did not know why he had given her the POA[3] and could not recall anything about the closing in connection with the refinancing.

On February 6, 1999, a note and mortgage in the amount of $115,600 was executed with Contimortgage Corporation ("Conti Mortgage"). *See* Plaintiff's Exhibit Q. Both the Plaintiff and the Debtor are identified on the note as "borrowers."[4] *Id.* Approximately $95,000 of the proceeds was used to pay off the Champion Mortgage. In addition, there was testimony that Contimortgage Corporation had required that the Debtor's name be included on the deed to the New Hampshire property.[5] The Debtor testified that he recalled his name being added to the deed but did not

---

[3] According to the Debtor, the POA of attorney he had executed in January 1999 was revoked in the course of the divorce action after E. Burlingame had used it to increase the credit limits on the Sears account.

[4] There was no testimony regarding whether the note was signed by the Debtor or by E. Burlingame, using the POA.

[5] According to allegations made by the Plaintiff herein in her counterclaim asserted in a partition action commenced by the Debtor in 2001 in the Superior Court, Southern District, State

know why.[6]

The Debtor testified that he understood that he was responsible for a portion of the monthly mortgage payments. It was the Debtor's testimony that at the time the mortgages were executed, he was employed full-time by New Venture Gear in Syracuse, New York and had every intention of making the payments. He also testified that he had sought employment in New Hampshire and had been offered a position, but it did not pay enough to meet his obligations. According to the Debtor, he had a portion of his pay checks from New Venture Gear deposited directly into his and E. Burlingame's joint account to pay the mortgage or he sent money orders to E. Burlingame. The Debtor estimated that he had sent or given E. Burlingame directly approximately $300 - $400 per week for a period of time. E. Burlingame acknowledged receiving money from the Debtor "for a short period of time." It was the Debtor's testimony that he also understood that E. Burlingame was to contribute to the mortgage payments even though her name was not on the note. He testified that at the time she was operating a flower shop and indicated that she would be able to help with the payments from the income of the business.

---

of New Hampshire, to remove his name from the deed, the interest in the New Hampshire property was transferred to the Debtor on February 6, 1999. *See* Debtor's Exhibit 14. In that action, the Plaintiff herein sought damages of approximately $200,000 based on an alleged breach of contract as co-owner of the property with respect to the Debtor's alleged failure to pay the expenses associated with the real property, including the mortgage. *Id.* At the hearing on October 24, 2005, before this Court, the Debtor testified that after having spent approximately $50,000 of his pension in defending the counterclaim, he could no longer afford to litigate the matter and ultimately defaulted. A judgment, as listed in his Statement of Financial Affairs in the bankruptcy case, was awarded to the Plaintiff herein allegedly in June 2004.

[6] In the course of his testimony, the Debtor indicated that he had had cerebral palsy all of his life. In addition to physical limitations on his left side, he testified that he also has difficulty remembering an comprehending things. According to the Debtor, both the Plaintiff and E. Burlingame were aware of his disability.

According to the Debtor, it was not his idea to borrow the original $95,000. He testified that it had been E. Burlingame's and Plaintiff's idea to borrow the monies to pay the back taxes and to make certain repairs to the property in New Hampshire. However, E. Burlingame testified that her mother had never considered mortgaging her home until she and the Debtor had approached her.

D. Isola, Plaintiff's other daughter, testified that she was concerned when she learned about the mortgage because she knew that her mother could not afford to make any payments on it. She testified that in the Spring of 2000 she had a conversation with the Debtor in which he expressed some concerns that he might be going out on strike and if that were to occur, it would be difficult for him to continue making the mortgage payments. It was D. Isola's testimony that he had suggested to her that she and her husband sell their house and move to New Hampshire to help pay the mortgage. According to D. Isola, in approximately December 2000 the mortgage became seriously in default, and she and her husband cashed a money market certificate and used the proceeds to cure the arrears. At the time, they were living at the New Hampshire property belonging to her mother but had not sold their own house. On the day of the hearing, the Plaintiff testified that D. Isola and her husband continued to reside with her at the New Hampshire property and were making the mortgage payments.

The Debtor testified that at some point the marriage began to fall apart, noting that his former wife only came to visit him in Syracuse twice during the course of their marriage.[7] According to the Plaintiff, E. Burlingame filed for divorce sometime in 2001, allegedly at the

---

[7] Debtor and E. Burlingame were married on October 31, 1992, in Nashua, New Hampshire. *See* Debtor's Exhibit 11.

9

request of the Debtor.[8] As part of the divorce, Plaintiff testified that E. Burlingame had requested that any interest the Debtor had in the New Hampshire property be transferred to her. Although the Debtor did not recall having his name taken off the deed of the New Hampshire property as part of the divorce, there was evidence presented that a quit claim deed was executed on June 16, 2004, transferring the interest in the New Hampshire property from the Debtor to E. Burlingame pursuant to the divorce decree. *See* Debtor's Exhibit 10.

### DISCUSSION

At the completion of the Plaintiff's case, Debtor's counsel made a motion pursuant to Fed.R.Civ.P. 52(c), requesting that the Debtor be granted judgment as a matter of law. The Court notes that a judgment pursuant to Fed.R.Civ.P. 52(c) "'operates as a decision on the merits in favor of the moving party.'" *In re Fanelli*, 263 B.R. 50, 59 (Bankr. N.D.N.Y. 2001), quoting *Regency Holdings (Cayman), Inc. v. The Microcap Fund, Inc. (In re Regency Holdings (Caymant), Inc.)*, 216 B.R. 371, 374 (Bankr. S.D.N.Y. 1998).

Underlying any analysis of the Court pursuant to Code § 523(a) is a recognition that exceptions to discharge of a debt are to be "strictly construed against the creditor and liberally in favor of the honest but unfortunate debtor." *In re Kurtz*, 213 B.R. 253, 258 (Bankr. N.D.N.Y. 1997). The burden rests on the Plaintiff to establish by a preponderance of the evidence that the debt should not be discharged. *See Grogan v. Garner*, 498 U.S. 279, 286-91 (1991). At the same

---

[8] The Petition for Divorce, signed by E. Burlingame, is dated September 10, 2001. *See* Debtor's Exhibit 11.

time, the Court is cognizant that "a pro se litigant is generally afforded some degree of flexibility in demonstrating validity of its claim." *Fanelli*, 263 B.R. at 58 (citations omitted). In this regard, the Court has an obligation "'to make reasonable allowances to protect pro se litigants from inadvertent forfeiture of important rights because of the lack of legal training.'" *Id.* at 59, quoting *Traguth v. Zuck*, 710 F.2d 90, 95 (2d Cir. 1983).

Code § 523(a)(2)(A) provides an exception to the dischargeability of a debt which arose as a result of a debtor's false pretenses, false representation or actual fraud. The Plaintiff must establish (1) that the Debtor made the representation; (2) that he knew it was false at the time; (3) that he made it with the intention and purpose of deceiving the Plaintiff; (4) that Plaintiff justifiably relied on the representation; and (5) that Plaintiff sustained a loss as a result of her reliance on the representation. *See Fanelli*, 263 B.R. at 59-60.

In support of her complaint, Plaintiff directs the Court's attention to *Matter of Milbank*, 1 B.R. 150 (Bankr. S.D.N.Y. 1979). In that case, one of the plaintiffs had been married to the debtor. The other plaintiff was the debtor's former father-in law. At one point in the marriage, the debtor had left the marital residence, only to return approximately five months later. *Id.* at 152. Approximately nine months later, he sought a loan from his then father-in-law of $10,000 to be used for partial payment for the purchase of a commercial building where he could conduct his custom-made furniture business. According to the ex-father-in-law, it was his understanding that the new location would allow the debtor to spend more time with his wife and children. *Id.* At approximately the same time, the debtor's then wife also advanced him monies for the purchase of a vehicle to be used in his business and for the acquisition of the commercial building. *Id.* The loans/advances were obtained between August and November 1977. At the

trial, there was testimony that the debtor had rented an apartment in October 1977 "where the consorting neighbor visited him and had sex." *Id.* Debtor's wife learned of the affair in December 1977 and in January 1978 the debtor moved out of the marital residence. *Id.* at 152-53. The court made a factual finding that the loans and advances, which the debtor had never repaid, "were predicated on a joint effort by the bankrupt and his former wife to attempt to make their previously troubled marriage work." *Id.* at 152. The court noted that during the time when the loans and advances had been made to the debtor, he had been having an affair with his next door neighbor. *Id.* The court concluded that the debtor's "false pretense [that he was making a good faith effort to stabilize his marriage] was instrumental in obtaining the loans because the plaintiffs had made the advances in reliance upon the bankrupt's express request for a display of faith at a time when he was faithless." *Id.* The court held that the indebtedness was nondischargeable based on the debtor's false representations to the plaintiffs that he was working at keeping his marriage together when, in fact, he was actually involved in an adulterous relationship at the time. *Id.* at 154-55.

The case herein is easily distinguishable from the facts in *Milbank*. In this case, the Debtor does not deny that at the time the two mortgages were executed in September 1998 and February 1999, respectively, he had told the Plaintiff that he would have no trouble making the mortgage payments, albeit with the help of E. Burlingame, since he was gainfully employed at the time in Syracuse. At the time of the execution of the mortgages, the Debtor was working full-time in Syracuse and commuting to New Hampshire on weekends and holidays. It appears that he made a good faith effort to make payments on the mortgage debt and contribute to the household expenses and/or repairs on the New Hampshire property until sometime in 2000.

12

With respect to the second factor, the Plaintiff testified that she understood from representations made by the Debtor and her daughter that in addition to paying the taxes owed on the New Hampshire property and paying some of the obligations incurred by E. Burlingame in connection with her floral business, the monies were to be used to pay off the Debtor's debts so that he could relocate to New Hampshire. At the trial, she indicated that she believed that the representations made by the Debtor were false and that he never intended to make the payments and never intended to move to New Hampshire to live with his then wife, E. Burlingame. However, the Plaintiff failed to provide any evidence to support that belief. According to the testimony of D. Isola, it was not until April 2000, more than a year after the refinancing, that the Debtor expressed concerns that he would no longer be able to make the payments because of the possibility of a strike. In addition, there was no evidence that at the time he discussed taking out the mortgage on the New Hampshire property in late 1998 and early 1999 that the Debtor was intending to divorce E. Burlingame and to remain in Syracuse. Indeed, the Debtor testified that he had sought employment in New Hampshire but that the monies would have been insufficient to meet his obligations, including the payments on the mortgage. In addition, the evidence presented indicates that it was not until September 2001, approximately three years after the first mortgage was executed, that E. Burlingame, allegedly at the Debtor's suggestion, filed for divorce.

The Court concludes that the Plaintiff has failed to meet her burden by a preponderance of the evidence. She failed to prove that the Debtor made any misrepresentations at the time of the execution of the two mortgages which he knew to be false and that was intended to deceive the Plaintiff by a preponderance of the evidence. Accordingly, the Court need not address

whether the Plaintiff justifiably relied on the representations made by the Debtor and whether the Plaintiff sustained a loss as a result of any such reliance.

Based on the foregoing, it is hereby

ORDERED that Debtor's motion pursuant to Fed.R.Civ.P. 52(c) is granted; it is further

ORDERED that Plaintiff's complaint seeking a determination of nondischargeability with respect to debt owed her by the Debtor pursuant to the New Hampshire judgment is dismissed; and it is finally

ORDERED that Debtor's request for attorney's fees and costs is denied.[9]

Dated at Utica, New York

this 4th day of April 2006

STEPHEN D. GERLING
Chief U.S. Bankruptcy Judge

---

[9] Code § 523(d) provides for an award of costs and attorney's fees to a defendant on the basis that the complaint was not substantially justified. Based on the facts presented, the Court concludes that the position taken by the Plaintiff was reasonable under the circumstances.